Gary LEE, et al., Plaintiffs,

v.

STATE of Oregon, et al., Defendants.

Civ. No. 94–6467–HO.

United States District Court,
D. Oregon.

Dec. 27, 1994.

Thomas O. Alderman, Eugene, OR, for Gary Lee, MD and William Petty, MD, on behalf of their patients, Eric S. Dutson, individually and as a representative of a class of terminally ill Oregon individuals with disabilities, Janet Elsner, individually and as a representative of a class of Oregon patients who are terminally ill even with treatment, Jef-

frey M. Weinkauf, Individually and as a representative of a class of Oregon patients who are terminally ill without treatment, Fritz Beck, June Beck, Claudine Stotler, individually and as a representative of a subclass of person who have the disability of a terminal disease even with medical treatment and who are being or will be treated at the Oregon Health Sciences University Hosp., Geraldine Bernards, individually and as Adm'r of Maryville Nursing Home Inc., Maryville Nursing Home Inc., Douglass F. Harcleroad, in his official capacity as the District Attorney for Lane County, Oregon, and as a representative of the class of all district attorneys in the State of Oregon.

Theodore R. Kulongoski, Thomas A. Balmer, Stephen K. Bushong, Dept. of Justice, Salem, OR, for defendants Douglass F. Harcleroad, in his official capacity as Dist. Atty. for Lane County, OR, and as representative of the class of all Dist. Attys. in State of OR, Theodore Kulongoski, in his official capacity as Atty. Gen. of OR, Terry L. Connor, DO, in his official capacity as Chairman of OR Bd. of Medical Examiners, Edward A. Heusch, DO, in his official capacity as Vice-chairman of OR Bd. of Medical Examiners, Catherine M. Nater, in her official capacity as Secretary of OR Bd. of Medical Examiners, John W. Grigsby, MD, Sarah S. Hendrickson, MD, George A. Porter, MD, James H. Sampson, MD, Rosemary C. Lee Selinger, MD, Fred R. Stark, MD, Maralyn E. Turner, J. Bruce Williams, MD, in their official capacity as members of OR Bd. of Medical Examiners, State of OR, OR Health Sciences University, Hosp.

Michael L. Williams, Jeffrey S. Merrick, Williams & Troutwine, PC, Portland, OR, for intervenors-defendants Tedd Levin, Tim Shuck, Jean Yukich.

Charles F. Hinkle, Stoel Rives Boley Jones. & Grey, Portland, OR, for intervenors-defendants Peter Goodwin, Barbara Coombs Lee, Elven Sinnard.

## OPINION

HOGAN, District Judge.

Before the court is Measure 16, passed by Oregon voters on November 8, 1994. This law, for the first time in the history of this country, authorizes physician assisted suicide for the terminally ill. The law invokes profound questions of constitutional dimension. The narrow issue presented at this juncture is whether those questions justify a brief delay in the implementation of this law. For the reasons set forth below, I find that the balancing of the important factors in this case merits a postponement of the implementation of the legislation until the constitutional concerns are fully heard and analyzed, which will be scheduled as soon as practicable.

Plaintiffs are two physicians, four terminally ill or potentially terminally ill patients, a residential care facility, and individual operators of residential care facilities. Plaintiffs claim Measure 16 violates the Equal Protection and Due Process Clauses of the Fourteenth Amendment, the First Amendment rights of freedom to exercise religion and to associate, and the Americans with Disabilities Act. I granted plaintiffs' motion for a temporary restraining order (# 39) on December 7, 1994. I heard oral arguments and took evidence on plaintiffs' motion for a preliminary injunction (# 21) on December 19, 1994. The following are my findings of fact and conclusions of law concerning that motion, in accordance with Fed.R.Civ.P. 52(a).

*Standing*

Defendants argue that plaintiffs are not entitled to a preliminary injunction because they lack standing. A threshold question in every federal case is whether a plaintiff has sufficiently alleged a "case or controversy" within Article III of the United States Constitution. *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Standing does not depend on a determination of the merits of a claim, rather on the nature and source of the claim. The question is whether a statutory provision on which the claim rests can be understood to allow the plaintiffs a right to seek relief.

A plaintiff invoking federal court jurisdiction must establish, at an irreducible constitutional minimum that: (1) they have suffered an "injury in fact" or an invasion of

a legally-protected interest which is concrete and particularized and "actual or imminent," (2) there is a causal connection between the injury and the challenged conduct, and (3) it must be likely that the injury will be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife,* —— U.S. ——, ——, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). The United States Supreme Court has recognized that "imminence" is an elastic concept, but one which must be limited so that an alleged injury is not too speculative. *Lujan v. Defenders of Wildlife,* —— U.S. ——, —— – —— at n. 2, 112 S.Ct. 2130, 2138–39 at n. 2 (alleged injury to occur at some indefinite future time is not sufficient). The injury must proceed with a "high degree of immediacy, so as to reduce the possibility of deciding a case in which no injury would have occurred at all." *Id.*

Plaintiff Weinkauf is a diabetic who argues that diabetes may fit within the definition of "terminal disease" under Measure 16, if he ceases taking insulin. It is undisputed that plaintiffs Dutson, Elsner, and Stotler have terminal illnesses. All claim that they would not choose assisted suicide while exercising sound judgment. The record does not reveal whether any have contemplated suicide in the past. The gist of their claims is that they may, at some future time, request physician assisted suicide due to undue influence caused by judgment-impairing depression, or other inappropriate influence.

Hopefully, these plaintiffs will never experience the severe, judgment-impairing, undiagnosed depression which concerns them. If they do not, they will not benefit from a ruling in their favor. However, I must consider the unique facts presented by this action. Interpreting the "imminence" requirement too strictly may lead to claims becoming moot on account of plaintiffs' deaths. One may ask, if a terminal patient does not have standing, who does? However, because this court finds that both the physician and residential care provider plaintiffs have standing (see below), it is not necessary to decide at this time whether these plaintiffs have standing.

■ Aside from this minimum constitutional mandate, the Supreme Court has rec-

ognized a prudential limit on the class of persons who may invoke the court's powers. There is a general rule that a plaintiff may not claim standing to pursue the constitutional rights of a third party. However, this general rule has not been applied where its underlying justifications are absent.

■ There are three criteria for determining third-party standing: (1) the litigant must have suffered an "injury-in-fact" giving them a sufficiently concrete interest, (2) the litigant must have a close relationship to the third party, and (3) there must exist some hindrance to the third party's ability to assert their own right. *Powers v. Ohio,* 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991); *Singleton v. Wulff,* 428 U.S. 106, 114, 96 S.Ct. 2868, 2874, 49 L.Ed.2d 826 (1976). As to the first element, the Supreme Court has held that two physicians had standing to challenge the constitutionality of a Missouri statute excluding abortions that are not "medically indicated" from medicaid coverage. *Id.* The Court found that there was a sufficient injury in fact because, if they prevailed, they would benefit by receiving payment for the abortions. As to the second element, if the enjoyment of the third party's right is "inextricably bound up" with the activity the litigant wishes to pursue, the court is assured that its construction of the right will be necessary, rather than simply advisory. *Id.* at 114–115, 96 S.Ct. at 2874. The relationship between the litigant and the third party may be such that the former is as effective a proponent of the right as the latter. The doctor-patient relationship has been found to be a sufficiently close relationship to support third party standing. *Singleton v. Wulff,* 428 U.S. 106, 115, 96 S.Ct. 2868, 2874, 49 L.Ed.2d 826 (1976). Even where the relationship is close, the reasons for requiring persons to assert their own rights still apply, unless there is some genuine obstacle to this assertion. *Id.* at 116, 96 S.Ct. at 2874. Protection of privacy and imminent mootness have been recognized as sufficient obstacles. *Id.* at 117, 96 S.Ct. at 2875.

■ Defendants argue that the two physician plaintiffs lack standing to assert claims on behalf of their patients. Both Drs. Lee

and Petty state for purposes of standing only, that if one of their patients commits suicide, they will no longer receive payment for services. Affidavits # 36, # 23. The physician plaintiffs have met their burden to show a direct financial impact on their practices and an injury-in-fact if Measure 16 goes into effect. *See Diamond v. Charles,* 476 U.S. 54, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986), and *Singleton v. Wulff, supra.*

Plaintiff Dr. Lee specializes in oncology and hematology, and is a medical director of the Sacred Heart Hospital Hospice. Affidavit of Plaintiff Gary L. Lee # 36. Plaintiff Dr. Petty specializes in gynecologic oncology. Affidavit of Plaintiff William Petty # 23. A majority of their caseloads are cancer patients who are expected to die. Dr. Lee states that some of his patients fall into such severe depression that they become dysfunctional. Affidavit # 36. Several have approached him requesting assistance in ending their lives. *Id.* He claims that almost no one chooses suicide if their physical, emotional, social, and spiritual needs are met. *Id.* He states that he does not have specialized training in identifying debilitating depression or suicidal tendencies. *Id.* Both physician plaintiffs state that significant numbers of their patients will seek physician assistance in ending their lives prematurely due to severe depression or undue influence, if Measure 16 takes effect. Affidavits # 23, # 36.

The physician plaintiffs have demonstrated sufficiently close relationships with their patients, including those with severe depression and suicidal thoughts. Some terminally ill patients have willingly set aside their personal privacy interests to join this litigation, on both sides. However, the greatest obstacle to terminal patients asserting constitutional rights they may have to challenge Measure 16 is the possibility of claims becoming moot due to death prior to a final resolution. The physician plaintiffs have sufficiently demonstrated standing to protect constitutional rights of their patients.

■ Defendants argue that the residential care plaintiffs, Fritz and June Beck, Sister Geraldine Bernards, and Maryville Nursing Home, lack standing because they are not required to participate in implementing Measure 16. Section 4 of the Measure provides, in relevant part:

(4) No health care provider shall be under any duty, whether by contract, by statute or by any other legal requirement to participate in the provision to a qualified patient of medication to end his or her life....

First Amended Complaint # 17, Exhibit A. The gist of these plaintiffs' claims is that: (1) some "participation" under the Measure is unavoidable and would violate their First Amendment right to free exercise of religion, unless (2) they choose to transfer a patient to another facility, but that forcing such a choice violates their First Amendment right to free association. First Amended Complaint # 17, Count Five; Affidavit of Plaintiffs Fritz and June Beck # 52; Supplemental Affidavit of Fritz and June Beck # 53; Affidavit of Plaintiff Geraldine Bernards # 63. In addition, plaintiff Bernards states that Oregon Administrative Rules, Chapter 411, Division 88, prohibits a nursing home from involuntarily transferring patients under many circumstances. Affidavit # 63.

Again, standing does not depend on a determination of the merits of these claims, rather on the nature and source of the claims and plaintiffs' connection to them. The residential care plaintiffs have sufficiently demonstrated a legally-protected interest, a possible invasion of which is imminent if Measure 16 takes effect, a causal connection, and a likelihood their injury, if proven, will be redressed by a favorable decision. The physician plaintiffs have also demonstrated sufficient standing to assert First Amendment claims on their own behalf.

Intervenors Goodwin, Lee, and Sinnard argue that plaintiffs' claims are not ripe. However, the physician and residential care plaintiffs have presented sufficient evidence that they currently have patients whose interests will be affected if Measure 16 takes effect.

The attorney for these intervenors also raised potential jurisdictional issues related to other state defendants at oral argument. It may also be appropriate for the constitutionality of Measure 16 to be tested in state court under state constitutional jurispru-

dence before review under the United States Constitution. The court will address these issues when they have been formally raised and properly briefed.

*Standards for Preliminary Injunction*

■ A party seeking preliminary injunctive relief must meet one of two tests. Under the first, a court must find that:

(1) the [moving party] will suffer irreparable injury if injunctive relief is not granted, (2) the [moving party] will probably prevail on the merits, (3) in balancing the equities, the [non-moving party] will not be harmed more than [the moving party] is helped by the injunction, and (4) granting the injunction is in the public interest.

*Stanley v. University of Southern California,* 13 F.3d 1313, 1319 (9th Cir.1994) (citation omitted). Alternatively, a court may issue a preliminary injunction if the moving party demonstrates either a combination of probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in its favor. The formulations under the alternative tests "represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *Miller v. California Pacific Medical Center,* 19 F.3d 449, 456 (9th Cir.1994), quoting *United States v. Odessa Union Warehouse Co-op,* 833 F.2d 172, 174 (9th Cir.1987). If the balance of harm tips decidedly toward the plaintiff, then the plaintiff need not show as robust a likelihood of success on the merits as when the balance tips less decidedly. *Benda v. Grand Lodge of Int'l Ass'n of Machinists & Aerospace Workers,* 584 F.2d 308, 315 (9th Cir.1978), *cert. dismissed,* 441 U.S. 937, 99 S.Ct. 2065, 60 L.Ed.2d 667 (1979).

Serious questions are "substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation." *Gilder v. PGA Tour, Inc.,* 936 F.2d 417, 422 (9th Cir.1991) (citation omitted). "Serious questions need not promise a certainty of success, nor even present a probability of success, but must involve a 'fair chance of success on the merits.'" *Id.* (citation omitted); *see also, State of Alaska v. Native Village of Venetie,* 856 F.2d 1384, 1389 (9th Cir.1988) (equating fair chance of success with raising serious questions on the merits). Even if the balance of hardships tips decidedly in favor of the moving party, it must be shown as an irreducible minimum that there is a fair chance of success on the merits or questions serious enough to require litigation. *Stanley v. University of Southern California,* 13 F.3d 1313 at 1319; *Sports Form, Inc. v. United Press Intern., Inc.,* 686 F.2d 750 (9th Cir.1982) (citation omitted). No chance of success at all will not suffice. *Id.*

*Equal Protection*

Plaintiffs allege that Measure 16 violates the rights of the terminally ill to equal protection under the law. Under Oregon law, a person may be convicted of manslaughter in the second degree for intentionally causing or aiding another to commit suicide. ORS 163.125. In addition, a person acting with a reasonable belief, is justified in using physical force on another to thwart a suicide attempt. ORS 161.205. Oregon law also provides for commitment proceedings for a person who, because of a mental disorder is "dangerous to self." ORS 426.070 *et. seq.* Measure 16 arguably creates exceptions to coverage of these statutes for terminally ill patients. It prohibits criminal liability for anyone who participates in good faith within its terms, and provides that a patient's request for assistance cannot be the sole basis for the appointment of a guardian or conservator. Amended Complaint # 17, Exhibit A, Section 4.01(1), (3).

■ The Equal Protection Clause of the Fourteenth Amendment states that no state shall "deny to any person within its jurisdiction the equal protection of the laws." This means that all persons similarly situated should be treated alike. *Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982). "The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Schweiker v. Wilson,* 450 U.S. 221, 230, 101 S.Ct. 1074, 1080, 67 L.Ed.2d 186 (1981). The Equal Protection Clause allows states wide latitude when so-

cial legislation is at issue. However, the rational basis test does not apply where a state law impinges on personal rights protected by the Constitution or involves a suspect class. In such a case, the state law must be suitably tailored to serve a compelling state interest. *City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985) (race, gender, alienage, national origin are suspect classes, while age and mental retardation are not).

◼ Among the questions concerning whether plaintiffs' rights to equal protection under Oregon law will be violated are the following:

1. Must the state show only that Measure 16 is rationally related to a legitimate state interest?

2. The state has identified its interests in Measure 16 as preventing continued pain and suffering of competent terminally ill patients and support of Oregon voters' rights to participate in the democratic process. However, "pain and suffering" is not contained in the terms of Measure 16.

3. Is there a rational basis for the classification of "terminally ill" patient if, as plaintiffs claim:

a. Physicians often misdiagnose terminal illness (*See* Affidavit of Dr. Fenigsen # 33), or

b. A physician's prognosis of six months to live is often fallible, i.e., plaintiff Stotler claims she was given 6 months to live in 1992 (Affidavit # 26) and *see* Affidavit of Dr. Fenigsen # 33, or,

c. It may be contrary to reasoned medical judgment to include a patient who can live a normal life span with medication, i.e., a diabetic taking insulin, but not without it.

4. Is it a legitimate state interest to provide that only competent individuals can receive a lethal dosage, but remain silent about whether only competent individuals can take that lethal dosage?

5. Are persons who have a terminal disease disabled for purposes of the Americans With Disabilities Act and if so, does this mean they are a suspect class?

6. Must Measure 16 serve a compelling state interest, and does it?

7. Does Measure 16 "deny" terminally ill patients the protections of Oregon's criminal and civil commitment statutes or does it give them the benefit of opting out of coverage under those laws?

*Due Process*

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." Plaintiffs allege that Measure 16 unconstitutionally deprives persons who have the disability of a terminal disease of protections for their right to live. They also claim that Measure 16 violates plaintiffs' liberty interests because it does not sufficiently guarantee that the choice to end life will be both informed and voluntary.

The concept of "liberty" has been well-articulated in the plurality opinion in *Planned Parenthood v. Casey*, —— U.S. ——, ——, 112 S.Ct. 2791, 2807, 120 L.Ed.2d 674 (1992):

Our law affords constitutional protection to personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education.... These matters, involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment. At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life. Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State.

Measure 16 is the first attempt by a state to sanction physician assisted death.[1] Many states have statutes which criminalize an in-

---

1. Measure 16 provides that "[a]ctions taken in accordance with this Act shall not, for any purpose, constitute suicide, assisted suicide, mercy

killing or homicide, under the law." Amended Complaint # 17, Exhibit A, Section 3.14.

dividual's conduct in aiding another to commit or attempt to commit suicide. Terminally ill patients and their physicians have challenged such statutes as violations of fundamental liberty interests to choose physician assisted death. *See, e.g., Compassion in Dying v. State of Washington,* 850 F.Supp. 1454 (W.D.Wash.1994) (on appeal); *Quill, et al. v. Koppell,* 870 F.Supp. 78 (S.D.N.Y.1994) (opinion by Chief Judge Griesa); *Hobbins v. Attorney General,* 447 Mich. 436, 1994 WL 700448, —— F.Supp. —— (Mich. Dec. 13, 1994). These courts have reached contrary results.

The Supreme Court's decision in *Cruzan v. Director, Missouri Dept. of Health,* 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990) is helpful. In *Cruzan,* the issue was whether the Due Process Clause allowed a state to require a currently incompetent patient in an irreversible vegetative state to remain on life support absent clear and convincing evidence that avoiding the treatment represented that patient's choice while competent. The Supreme Court held that a competent person has a liberty interest in refusing unwanted medical treatment, but stopped short of deciding that such a person had a constitutionally protected right when death was the likely result. The Court also found it permissible for the state: (1) to require additional safeguards for incompetent patients to assure that ending life was within their express wishes while competent, and (2) to decline to make judgments about the quality of life an incompetent person may enjoy and simply assert an unqualified interest in the preservation of life. Justice O'Connor, in a concurring opinion noted:

> Today we decide only that one state's practice does not violate the Constitution; the more challenging task of crafting appropriate procedures for safeguarding incompetents' liberty interests is entrusted to the "laboratory" of the States, *New State Ice Co. v. Liebmann,* 285 U.S. 262, 311, 52 S.Ct. 371, 386–87, 76 L.Ed. 747 (1932) (Brandeis, J., dissenting), in the first instance.

There are serious questions on the merits of the due process claims, because Measure 16 is the first of its kind and the Supreme Court has expressly limited its holdings on related issues. Among the serious questions raised and which require further briefing and argument are:

1. Does Measure 16 deprive a person of constitutional rights? Before a state can allow an individual to waive a federal constitutional right, must it also ensure that the waiver is voluntary and informed? [2]

---

2. Among the questions raised by plaintiffs are the following:

Are there sufficient "due process" safeguards to ensure that a judgment-impaired, or unduly influenced patient is not allowed to request assisted death?

Section 3.03 of Measure 16, provides that a requesting patient is referred to a licensed psychologist or psychiatrist only if the attending or consulting physician believes the patient may not be able to make a voluntary choice. Should these physicians also be deciding whether "a patient may be suffering from a psychiatric or psychological disorder, or depression causing impaired judgment"?

According to Dr. Carol Gill, research indicates that up to 95% of persons who wish to commit suicide are suffering from depression or other emotional disorders that could be eased or eliminated through support, therapy, or medication. Affidavit of Dr. Carol Gill, Ph.D. # 29. According to Dr. Patricia Wesley, a recent suicide study in Cook County, Illinois, indicates that 88–94% had a psychiatric disorder at the time they committed suicide, 25% had seen a physician within 24 hours of death, 41% within one week of death, and 70% within one month of death. The con-

tacts were for vague physical complaints. "The general practice physician did not, and probably could not have picked up either the psychiatric condition or the suicidal intention." Affidavit of Patricia Wesley, M.D. (# 28), citing David C. Clark, "Rational Suicide and People with Terminal Conditions or Disabilities," 8 *Issues In Law & Med.* 147, 152 (1992). This is not to minimize the contrary affidavits of defendants' experts, who have far different opinions of the connection of depression with suicide, but plaintiffs' experts are cited here because it is the plaintiffs' burden to raise the questions.

Section 3.05 of Measure 16 provides that an attending physician shall ask a patient to notify next of kin of the request for a lethal dosage of medication but the request cannot be denied if the patient declines or is unable to notify. Should family or guardian notification be required, when possible, because it may be significant: (a) in diagnosing the severity of a patient's depression, (b) in providing emotional support that may be lacking and lead the patient to decide to live, (c) in assisting a trained professional to determine whether the patient is being unduly influenced?

2. A state does not have a constitutional duty to protect members of the general public, with a few exceptions. *DeShaney v. Winnebago County DSS*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). Does this rule of law apply when the state enacts a law and allows a state operated facility, Oregon Health Sciences University, to implement the law on its premises?

3. Is plaintiffs' due process claim, in essence, a facial constitutional challenge to Measure 16 and if so, what is the appropriate test to determine the constitutionality of Measure 16?

4. If Measure 16 implicates a terminally ill person's liberty interest, does that interest outweigh that of the state?

*Americans with Disability Act*

Plaintiffs allege that "Ballot Measure 16 unlawfully deprives persons who have the disability of a terminal disease of protection afforded other persons under Oregon law in violation of the Americans with Disabilities Act (ADA) and to the extent the statute applies to federally funded programs, Section 504 of the Rehabilitation Act of 1973." First Amended Complaint (# 17), p. 31.

Defendants argue that the ADA does not require any disabled individual to utilize assisted suicide.

Defendants' arguments in this regard assume that the "option" of assisted suicide is a "benefit" under the law.

The parties arguments about the application of the ADA to Measure 16 involve whether the "option" of assisted suicide is a "benefit" or a "deprivation" under the law. It may be necessary to decide whether the parties positions are based on philosophical, moral, or religious beliefs or whether they are subject to statutory analysis.

Plaintiffs' ADA claim raises interesting questions. It is unnecessary to decide whether these questions are "serious" because a preliminary injunction may issue based on my earlier findings.

*Vagueness*

Plaintiffs allege that the definition of "terminal illness" in Measure 16 is unconstitutionally vague, and, therefore, violates the due process and/or equal protection clause of the Fourteenth Amendment.

Defendants argue that "regardless of the 'vagueness' of the definition, Measure 16 does not mandate or prohibit any particular conduct." Defendants' Memorandum (# 69), p. 28.

In *Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972), the United States Supreme Court held:

It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them.

*Grayned v. City of Rockford, supra* at 108, 92 S.Ct. at 2298–99. Where a criminal statute fails to meet these standards, it is "void for vagueness." *Colautti v. Franklin*, 439 U.S. 379, 390–91, 99 S.Ct. 675, 683, 58 L.Ed.2d 596 (1979).

Ballot Measure 16 defines "terminal illness" as "an incurable and irreversible disease that has been medically confirmed and will, within reasonable medical judgment, produce death within six months." Section 1.01(12).

Plaintiffs argue that some diseases, such as diabetes, are terminal absent regular medi-

---

Are safeguards required so that a terminally ill, judgment-impaired or unduly influenced patient is not allowed to take a lethal dosage, even if they received the lethal dosage when they were competent?

Are there sufficient safeguards so that terminally ill patients are making an informed choice? Is it necessary for an independent third party, i.e., a probate or other court, to oversee decision for and implementation of an assisted death request?

cation and that the "statutory definition of this key term is unclear as to whether it sweeps in this class of persons or not." Brief in Support (# 22), p. 107. Therefore, the argument goes, doctors and health care facilities are exposed to liability because they cannot know whether to advise people with such illnesses of the alternative of assisted suicide under the requirements of the federal Patient Self–Determination Act, 42 U.S.C. § 1395cc(a)(1).

Defendants argue that the vagueness doctrine applies only when a law is so vague that persons subject to the law cannot determine what conduct is prohibited. *Grayned v. City of Rockford, supra.* "Because Measure 16 is strictly voluntary, it cannot be invalidated on the grounds of vagueness." Defendants' Memorandum, p. 29.

However, the "flip side" of what is prohibited by a statute is what is permitted. Since Measure 16 creates an exception to other Oregon criminal laws (*see e.g.,* section 4.01, "Immunities"), it may be illogical to hold that the vagueness doctrine is not applicable simply because the conduct permitted under the measure is "voluntary."

In *Grayned,* the Supreme Court noted: "Condemned to the use of words, we can never expect mathematical certainty from our language." *Grayned v. City of Rockford, supra* 408 U.S. at 110, 92 S.Ct. at 2300. "[I]t will always be true that the fertile legal 'imagination can conjure up hypothetical cases in which the meaning of [disputed] terms will be in nice question.'" *Id.,* at n. 15 (quoting *American Communications Ass'n v. Douds,* 339 U.S. 382, 412, 70 S.Ct. 674, 691, 94 L.Ed. 925 (1950)).

However, the rights and liabilities of a physician requested to intentionally provide a lethal prescription to an individual with a medically controlled terminal condition which may not involve great pain and suffering raises serious questions.

## First Amendment

Plaintiffs allege that certain provisions of Measure 16 require complicity of physicians and health care providers that is contrary to plaintiffs' religious and moral convictions and violates the Free Exercise Clause and free-

dom of association protections of the First Amendment and the Religious Freedom Restoration Act.

Plaintiffs contend that the following aspects of Measure 16 infringe on their freedom of association and freedom to exercise their religious beliefs:

1. Measure 16 requires health care providers to transfer records at a patient's request if a facility is unwilling to comply with the patient's wishes;

2. Oregon's "informed consent" law requires physicians to discuss available treatment options with patients. "As a result, Plaintiffs will be required to advise patients of their right to assisted . suicide." First Amended Complaint (# 17), p. 34.

3. The federal Patient Self–Determination Act, 42 U.S.C. § 1395cc(a)(1) et seq., requires health care facilities to inform patients of their rights under state law. "As a result, medical care facilities will be required in Oregon to advise patients of their right to assisted suicide and to appoint a witness to witness written requests for assisted suicide." *Id.* .

4. Measure 16 prohibits facilities from denying staff privileges to or otherwise disciplining physicians who choose to honor a patient's request for medication.

Defendants contend that plaintiffs' discussion of religious freedom is "largely irrelevant" because "(n)o one denies that freedom of association and the free exercise of religion are protected by the 1st Amendment." Defendants' Memorandum in Opposition (# 69), p. 29. Defendants argue that the "infringements" alleged by plaintiffs "do not really exist." *Id.,* p. 30.

If a health care provider or physician is required to perform acts to facilitate or accommodate a request for assisted suicide and based on sincerely held religious convictions, reasonably believes that their participation constitutes "complicity" in the suicide, there is a serious question regarding an infringement on religious beliefs against such conduct.

Defendants also argue that the issue whether a physician may be disciplined or

denied staff privileges for complying with a patient's request for medication under Measure 16 "is more properly litigated when and if that issue arises in a live dispute between a physician and a health care facility." Defendants' Memorandum, p. 31. However, as noted in the section regarding "irreparable harm," the loss of First Amendment freedoms even for "minimal periods of time" may constitute an irreparable injury.

*Irreparable Harm*

■ Under the "sliding scale" analysis described earlier, the required degree of irreparable harm increases as the probability of success decreases. *Oakland Tribune, Inc. v. Chronicle Publishing Co.*, 762 F.2d 1374, 1376 (9th Cir.1985). The logical corollary is that the greater the degree of irreparable injury, the less probability of success on the merits is required.[3]

Dr. Lee alleges that many of his patients suffer from depression, "although physicians are not well-trained in depression so the problem is generally undertreated." First Amended Complaint (# 17), p. 5. Dr. Lee further alleges that depression and the debilitating effects of the disability of a terminal disease make his patients highly susceptible to the suggestion that their lives are not worth living.

Defendants' argument that "(t)hese plaintiffs will suffer absolutely no harm whatsoever if the Measure takes effect," Defendants' Memorandum (# 69), p. 33, does not address plaintiffs' concern that terminally ill persons will in the future request assisted suicide due to undue influence from judgment impairing depression or other undue persuasion.[4]

Death is overwhelmingly final and not subject to reversal, mitigation, or correction.

Although death may be viewed as a release from suffering, it is nevertheless the end of life and, therefore, the legal equivalent to an injury to life. Death constitutes an irreparable injury and I find that the possibility of unnecessary death by assisted suicide has been sufficiently raised to satisfy the irreparable harm requirement for a preliminary injunction.

I have found above that serious questions are raised by plaintiffs' First Amendment claims. Therefore, it is also appropriate to consider the possibility of irreparable harm in connection with those claims.

In *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), non-civil service employees of the Cook County, Illinois sheriff's department brought a class action for declaratory, injunctive, and other relief, alleging that they were fired or threatened with dismissal for the sole reason that they were not affiliated with or sponsored by the political party of the current sheriff. The District Court found that the plaintiffs had failed to demonstrate irreparable injury, denied the motion for preliminary injunction and ultimately dismissed the complaint for failure to state a claim. The Court of Appeals reversed and remanded with instructions to grant appropriate preliminary relief. In affirming the judgment, the Supreme Court commented:

At the time a preliminary injunction was sought in the District Court, one of the respondents was only threatened with discharge. In addition, many of the members of the class respondents were seeking to have certified prior to the dismissal of their complaint were threatened with discharge.... It is clear therefore that First

---

**3.** "An essential prerequisite to the grant of a preliminary injunction is a showing of irreparable injury *to the moving party* in its absence." *Dollar Rent a Car v. Travelers Indem.*, 774 F.2d 1371, 1375 (9th Cir.1985) (emphasis added). Therefore, any consideration of the harm to defendants from being denied the availability of assisted suicide is more appropriately considered in terms of the balancing of hardships. The moving party must demonstrate a "significant threat of irreparable injury." *Oakland Tribune, supra* at 1376. However, it is not necessary to "weigh" the respective injuries to determine whether there is a potential irreparable injury.

**4.** In addition, expert testimony submitted by plaintiffs suggests that Measure 16 is a "public signal to many who harbor suicidal plans" and "an important political value statement." Supplemental Affidavit of David C. Clark, Ph.D. (# 43). Dr. Clark expects that many persons will pursue assisted suicide on the first days "when a sizeable back-log of 'pioneers,' publicity seekers, frightened medical patients, political activists, and psychologically compromised persons will rush" to be the first to die. *Id.* Defendants' experts believe just the opposite.

Amendment interests were either threatened or in fact being impaired at the time relief was sought. **The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.** *See New York Times Co. v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971). (emphasis added).

*Elrod v. Burns, supra,* 427 U.S. at 373, 96 S.Ct. at 2689–90.

I find that plaintiffs have demonstrated that irreparable harm to First Amendment rights could occur in the absence of a preliminary injunction.

*Public interest and balance of hardships:*

Plaintiffs' argument that "the public has a strong public interest in having constitutional guarantees enforced for all," Plaintiffs' Reply (# 75), p. 23, presupposes that Measure 16 in fact deprives some people of constitutional rights guaranteed to all citizens. My finding herein is only that serious questions are raised by plaintiffs' claims. Plaintiffs cannot bootstrap a presumed success on the merits into the balancing analysis.

Another hardship claimed by plaintiffs is the risk that suicide attempts by lethal drug overdose may fail to cause death and result instead in serious physical impairments and protracted suffering.[5]

The possible hardships created by the complications associated with failed suicide attempts and the public interest in protecting against misdiagnosed "terminal" (within six months) illness should be considered when evaluating the public interest.

As noted in *Cruzan v. Director, Missouri Dept. of Health,* 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990):

An erroneous decision not to terminate results in a maintenance of the status quo;

the possibility of subsequent developments such as advancements in medical science, the discovery of new evidence regarding the patients intent, changes in the law, or simply the unexpected death of the patient despite the administration of life-sustaining treatment at least create the potential that a wrong decision will eventually be corrected or its impact mitigated. An erroneous decision to withdraw life-sustaining treatment, however, is not susceptible of correction.

*Cruzan v. Director, supra* at 283, 110 S.Ct. at 2854.

It is also true, as defendants point out, that the public has a strong interest in the enforcement of laws duly enacted by a majority of the voting electorate. However, any law must survive constitutional scrutiny.

My findings concerning this motion are not intended to minimize the interests of individuals who may wish to avail themselves of the alternative provided by Measure 16 or to ignore that the prospect of constant pain constitutes an enormous hardship.

A preliminary injunction in this case results in the maintenance of the status quo for a limited period of time to thoroughly consider the constitutionality of Measure 16. Although the status quo will be regarded as a hardship by some terminally ill patients who want the "option" of physician assisted suicide to be immediately available, the public interest in protecting vulnerable citizens from the irreparable harm of death is greater. Surely, the first assisted suicide law in this country deserves a considered, thoughtful constitutional analysis.[6]

I find that the balance of hardships favors plaintiffs and that the issuance of the preliminary injunction sought by plaintiffs is in the public interest.

---

5. Jerome R. Wenow, a pharmacist and biomedical ethicist, indicates that the dosages of pentobarbital sodium or secobarbital sodium necessary to cause death in humans has not been determined. According to Dr. Pieter Admiraal, Wernow Affidavit (# 76), p. 3, 75% of physician assisted suicide patients die within three hours, the remainder "can last 32 days or longer." *Id.*

Barbiturate poisoning has been characterized by other experts as "the most uncertain method of taking one's life." *See* Wernow Affidavit (# 76), p. 4. If a patient fails to die after taking an "overdose," serious physical complications may arise and a "slow miserable death" may result. *Id.,* pp. 4–5.

6. It is the court's firm intention to require the parties to promptly prepare this matter for resolution on the merits.

## PRELIMINARY INJUNCTION

The court, having reviewed the plaintiffs' motion for a preliminary injunction, and being duly advised in the premises, hereby grants said motion.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that:

(1) the defendant Attorney General and the defendant district attorney are preliminarily enjoined from recognizing the exception from the homicide laws created by Oregon Ballot Measure 16 in the conduct of their criminal enforcement duties;

(2) defendant members of the State Board of Medical Examiners are preliminarily enjoined from recognizing the exception from the standard of professional conduct created by Oregon Ballot Measure 16 in the conduct of their duties involving licensure, quality control, continuing education, and discipline of physicians;

(3) the defendant Oregon Health Sciences University Hospital is preliminarily enjoined from allowing assisted suicides to be performed in its facilities;

(4) defendants are preliminarily enjoined from bringing any criminal, civil, or regulatory enforcement action based on Ballot Measure 16 against any plaintiff for refusing, on the basis of religious objection, to (a) advise a person with the disability of a terminal illness of his or her option to choose assisted suicide, either upon admission to a health care facility or in any informed consent to treatment dialogue; (b) transfer patient records to another physician or facility who intends to assist a patient in suicide; (c) provide or be a witness to the oral or written consent of a person to assisted suicide; (d) allow counseling regarding assisted suicide; (e) receive and record written and oral requests for assistance in suicide pursuant to Measure 16; (f) assist any physician with a patient suicide; and,

(5) defendants are preliminarily enjoined from recognizing the constitutionality of recently enacted Oregon Ballot Measure 16.

Pursuant to Fed.R.Civ.P. 65(c), nominal security is set in this matter in the amount of $1.00, to be posted in the form of cash or bond with the clerk of this court.

Pursuant to Fed.R.Civ.P. 65(d), this preliminary injunction is binding upon named defendants, their agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise.

IT IS SO ORDERED.